AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the

### District of Rhode Island

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Randall LEVESQUE | ) | 1:18-MJ-365 PAS |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___Dec. 2015 through Jan. 2017___ in the county of ___Newport___ in the

___ District of ___Rhode Island___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1343 | Wire Fraud |
| 18 U.S.C. 1028A | Aggravated Identity Theft |

This criminal complaint is based on these facts:

See attached Affidavit of Senior Special Agent John Petricig

☑ Continued on the attached sheet.

_____
*Complainant's signature*

John Petricig
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___10/26/2018___

_____
*Judge's signature*

City and state:    Providence, Rhode Island

Patricia A. Sullivan, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

FILED

2018 OCT 26  P 12: 04

| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 401-835-9054 AND THE ARREST OF RANDALL LEVESQUE | Case No. _____ |
| --- | --- |
| | **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR SEARCH AND ARREST WARRANTS

I, John Petricig, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the U.S. Secret Service, and have been since August 26, 2002.  I have personally investigated numerous financial crimes investigations to include but not limited to; bank fraud, wire fraud, identity theft, check fraud, credit card fraud and counterfeiting.  I was also a member of the Electronic Crimes Special Agent Program – Computer Forensics (ECSAP-CF) as a forensic examiner from 2005 thru 2010.  As an ECSAP-CF agent, I conducted numerous forensic examinations of electronic storage devices to include but not limited to hard disk drives (HDDs), computer servers and media storage devices.

2.      I make this affidavit in support of a complaint and my request for an arrest warrant for Randall LEVESQUE (hereinafter "LEVESQUE") for Wire fraud, in violation of 18 U.S.C. § 1343, and Aggravated identity theft, in violation of 18 U.S.C. § 1028A.

3.      I also make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number 401-835-9054 and used by Randall Levesque (the "Target Cell Phone"), whose service provider is AT&T, a wireless telephone service provider headquartered at 208 South Akard Street, Dallas, TX 75202.  The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is

described herein and in Attachment B.   Because this warrant seeks the prospective collection of

information, including cell-site location information, that may fall within the statutory definitions

of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. §

3123(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See*

18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required

to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

4.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrants and does not set

forth all of my knowledge about this matter.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that

LEVESQUE has violated 18 U.S.C. § 1343 and 18 U.S.C. § 1028A (the "Target Offenses")

resulting in a loss to the victims of over $1,000,000.  There is also probable cause to believe that

the location information described in Attachment B will assist law enforcement in: (1) locating

and arresting LEVESQUE, who is a "person to be arrested" within the meaning of Federal Rule

of Criminal Procedure 41(c)(4), and (2) locating and seizing the Target Cell Phone, which is

believed to be used by LEVESQUE to commit the Target Offenses.

6.      The court has jurisdiction to issue the proposed warrant because it is a "court of

competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court a district court of

the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. §

2711(3)(A)(i).

## PROBABLE CAUSE

### *Background*

7.     The United States, including U.S. Secret Service ("USSS"), is conducting a

criminal investigation of LEVESQUE regarding the Target Offenses.  LEVESQUE was an

insurance agent licensed in Rhode Island.  According to the online record of the National

Association of Insurance Commissioners, LEVESQUE obtained a license in 1997 and

surrendered his license in March 2017.

8.     LEVESQUE operated Insurance Services, a business in Middletown, RI.  He

employed three people in his office.[1]  LEVESQUE was an agent for Great American Insurance

Company ("GAIC") and American Equine Insurance Group ("AEIG").  He specialized in equine

insurance policies, selling both major medical and mortality insurance policies on behalf of

GAIC and AEIG.

9.     In or around December 2017, I received a complaint from GAIC that

LEVESQUE had misappropriated insurance premiums collected by him between in or around

December 2015 and in or around January 2017.  GAIC auditors informed me that their

investigation uncovered the following fraudulent activity in addition to the misappropriation of

---

[1] I interviewed Ana Forbes, Stephanie Mosher, and Karen Sjoren, LEVESQUE's employees.  All three denied knowledge of any wrongdoing. Stephanie claimed that LEVESQUE handled all financial aspects of the business. Stephanie said that she never saw or handled any of the billing statements from GAIC.  Stephanie said she would have no way of knowing if LEVESQUE was past due on his payments to GAIC. Stephanie did say that anyone that worked at Insurance Services had the ability to conduct credit card transactions.  Karen, who only worked part time and who did not have access to billing or bank accounts, said that she received a text from Stephanie one week before the GAIC audit described in paragraph 11 of the affidavit.  In this text, Stephanie told Karen that something was going with the business.  Karen also said that sometime after his divorce, LEVESQUE began to act "out of control."  She said he spent a lot of money and was trying to live the same lifestyle as his clients (based on my investigation I know that horse owners tend to be a prosperous group of people).  She said that LEVESQUE was more concerned with signing up clients and getting paid for policies than he was in making sure that the policies went through and were good.

insurance premiums:  (1) LEVESQUE submitted false and fraudulent financing agreements to premium financing companies without the insureds' knowledge or consent; (2) LEVESQUE collected financing for premiums for non-existent policies created in the name of a fictitious entity or an entity controlled by LEVESQUE; and (3) LEVESQUE overbilled insureds for premiums and billed insureds premiums for policies that he did not initiate with the insurance companies.

10.     As part of the investigation, a Rhode Island State Police Detective and I interviewed: (1) representatives of GAIC and AEIG, (2) representatives of two insurance premium financing companies, Premium Finance Corporation ("PFC") and Insurance Finance Corporation ("IFC"), and (3) insureds who had purchased equine insurance from LEVESQUE.  I also reviewed LEVESQUE's bank records and credit card records, insurance agreements, financing agreements, LEVESQUE's own Quickbook records obtained by GAIC, and summaries of insurance records provided by GAIC and AEIG.  Based on my investigation, I believe that LEVESQUE did in fact engage in a scheme to defraud insureds, insurance companies, financing companies, and his own credit card processing company.

### *Great American Insurance Company*

11.     According to representatives of GAIC, as an agent, LEVESQUE initiated equine policies by collecting basic information from the prospective insured and a 25% down payment. He was then supposed to send an application to GAIC to bind the insurance policy for the horse, usually by email, and then collect the necessary information from the insured, which he sent to GAIC for underwriting.  Once GAIC underwriting approved the issuance of the policy, GAIC used its electronic portal to send the policies to LEVESQUE for the insureds.  LEVESQUE was supposed to forward the policies to the insureds and collect the premiums.  Insureds could pay

their premiums in lump sums or in installments, typically monthly.  Each month GAIC would send a statement to LEVESQUE for the premiums that were due and LEVESQUE was supposed to forward the premiums collected.  LEVESQUE typically paid GAIC by wire transfer from Citizens Bank Acct. #0171 in the name of Insurance Services.  By the end of 2016, LEVESQUE had become significantly overdue on his premiums to GAIC prompting GAIC to investigate.

12.     On January 24 and 25, 2017, GAIC representatives audited LEVESQUE because his account was overdue.  During this review, an auditor noticed that LEVESQUE had collected a large number of premiums, which were never remitted to GAIC.  LEVESQUE also reviewed a statement provided by the auditors and indicated in writing on that statement whether he had collected a premium from the insured and what form of payment he had received.  According to the two GAIC representatives conducting the audit, LEVESQUE admitted to misappropriating premiums, and he asked them whether his situation was the worst they had ever seen.  He also admitted to creating fake or "ghost" policies that he used to obtain premium financing from financing companies for policies that did not exist.

13.     Upon discovering the fraud, GAIC sent out approximately 400 letters to LEVESQUE's clients to notify them of the problem.  GAIC honored the policies of all insureds who had paid their premiums.  The GAIC auditor reviewed GAIC records, LEVESQUE's business records, and records from the premium financing companies and determined that LEVESQUE collected and misappropriated over $800,000 in premiums from insureds for GAIC policies.  Ordinarily, LEVESQUE should have forwarded over $650,000 of that amount, net his commission, to GAIC.  Instead, LEVESQUE converted those premiums to his own use.

a.     I have interviewed a number of GAIC insureds, GAIC employees and reviewed records in an attempt to verify their claims regarding misappropriated premiums.

Based on these interviews and records, I believe that GAIC is correct that LEVESQUE converted GAIC's premiums to his own use.

      b.  For example, I reviewed text messages and GAIC records related to an equine policy of Insurances Services customer S.N. Based on these materials, I believe that LEVESQUE billed S.N. for a policy but did not initiate a policy with GAIC.

      i.  S.N. discovered that she did not have a valid insurance policy in June of 2017 when she attempted to file a claim with GAIC. S.N. provided GAIC with proof of three credit card payments to Insurance Services for an insurance policy on or about 10/18/16. S.N. provided copies of her credit card statement which showed the following charges; $718.75 on 10/18/16, $1,000.00 on 10/21/16 and $1,282.00 on 11/3/16.

      ii.  S.N. also provided a text message conversation between herself and LEVESQUE discussing the purchase of an insurance policy as well as instruction from LEVESQUE on three separate payments to be made on the policy.

      iii.  I was able to verify that the payments made by S.N. were processed by Insurance Services' credit card processor, Elavon, which matched the dates and amounts instructed by LEVESQUE.

      iv.  I was able to confirm with GAIC that they had not held a policy for S.N. since 10/16/15. I was also able to confirm that GAIC honored S.N.'s claim due to the fact that she provided proof of payments to Insurance Services.

      v.  I also reviewed PFC Finance Agreement # 34446 in the name of S.N. for a GAIC policy in the amount of $3,425.00. The finance agreement listed does not list a policy number, however, it lists the effective date of the GAIC policy as 10/17/16. I reviewed PFC records and determined that PFC deposited funds into LEVESQUE's Insurance Services

account, Acct. # 0171, in connection with the financing agreement. Again, per GAIC they did
not have any record of an insurance policy for S.N. on or about 10/17/16.

14.     I reviewed records from Citizens Bank for Acct. #0171 in the name of Insurance
Services and Acct. # 8162 in the name of Up to & Wider, LLC. LEVESQUE had signature
authority over both accounts. His wife also had signature authority over the Up 2 & Wider Acct.
# 8162, and up until September 2016, Stephanie Mosher and LEVESQUE's wife also had
signature authority over the Insurance Services account, Acct. #0171. I noticed the following
activity immediately prior to[2] and subsequent to GAIC's audit of LEVESQUE in Acct. # 8162
that I believe was an effort to dispose of fraudulent proceeds before GAIC discovered the fraud:

| DATE | ACTIVITY | DESCRIPTION | CREDITS | DEBITS |
|---|---|---|---|---|
| 1/23/2017 | Online Transfer | from: Insurance Services Acct. # 0171 | $ 130,000.00 | |
| 1/23/2017 | Online Transfer | from: Insurance Services Acct. # 0171 | $ 15,000.00 | |
| 1/23/2017 | Online Transfer | from: Insurance Services Acct. # 0171 | $ 600.00 | |
| 1/23/2017 | Online Transfer | from: Insurance Services Acct. # 0171 | $ 590.00 | |
| 1/24/2017 | Withdrawal | Check # 561 payable to: Randall Levesque | | $ 9,000.00 |
| 1/24/2017 | Online Transfer | to: Equine Insurance Services LLC Acct. # 7492 | | $ 3,600.00 |
| 1/25/2017 | Withdrawal | Check # 562 payable to: Cash | | $ 11,000.00 |
| 1/25/2017 | Withdrawal | Cash Withdrawal | | $ 20,000.00 |
| 1/25/2017 | Online Transfer | to: Equine Insurance Services LLC Acct. # 7492 | | $ 3,600.00 |
| 1/26/2017 | Online Transfer | to: Insurance Services Acct. # 0171 | | $ 5,000.00 |
| 1/26/2017 | Withdrawal | Cash Withdrawal | | $ 25,000.00 |
| 1/26/2017 | Withdrawal | Official Check # 514000778-1 payable to: Randall Levesque | | $ 40,010.00 |
| 1/26/2017 | Online Transfer | to: Insurance Services Acct. # 0171 | | $ 5,000.00 |
| 1/26/2017 | | Check # 566 payable to: Jeffrey B. Pine Esq | | $ 15,000.00 |

**_American Equine Insurance Group_**

---

[2] According to one of the GAIC auditors, they notified LEVESQUE that they were coming for an audit prior to their
January 24, 2017 arrival.

15.     My interview with Doug Panhorst, a representative of AEIG, revealed similar

irregularities.  According to Mr. Panhorst, LEVESQUE was a broker for AEIG.  In the ordinary

course, LEVESQUE secured applications, emailing or faxing them to AEIG for underwriting.

Upon approval and issuance of the policies, AEIG would send the policy documents to

LEVESQUE for the insureds.  LEVESQUE was responsible for collecting payments from the

insureds and remitting those payments to AEIG, usually via check.  By the end of 2016 and early

2017, LEVESQUE started to have problems, although Mr. Panhorst did not realize the extent of

the problems until LEVESQUE's business, Insurance Services, closed following the GAIC audit.

Once Insurance Services closed, Mr. Panhorst conducted an audit.  He identified a number of

policies for which the insureds provided him with proof of payment to LEVESQUE, but for

which AEIG had not received payment from LEVESQUE.  AEIG nonetheless honored the

policies because the insureds had paid LEVESQUE.  This resulted in a loss of over $30,000 to

AEIG net LEVESQUE's commission.  Mr. Panhorst said that during the audit he discovered that

LEVESQUE had overbilled insureds as well.

### *Premium Finance Corporation*

16.     My interview with GAIC auditors alerted me to LEVESQUE's misappropriation

of financed premiums.  I interviewed Erin Gallagher, Director – Risk Placement Services at

Premium Finance Corporation (PFC).  PFC is a company that provides premium financing to

insureds.  During the interview, she explained to me how LEVESQUE (d/b/a Insurance Services)

initiated financing for insureds who wanted to finance their insurance premiums.  PFC used an

online system into which LEVESQUE or one of this staff would input the insured's information

and information about the equine policy being financed.  Once the finance agreement was

"activated" at the request of Insurance Services, PFC would notify the insurance company and

send a welcome packet to the insured.  PFC then direct deposited the premium into

LEVESQUE's Insurance Services account, Acct. # 0171, at Citizens Bank.

17.     According to Ms. Gallagher, PFC became aware of the problems with

LEVESQUE in early February 2017.  PFC began to work with GAIC to determine how many

financing agreements submitted by Insurance Services were legitimate agreements entered into

by the insured.  They contacted insureds and learned that Insurance Services had submitted

numerous fraudulent agreements.

a.   I interviewed Insurance Services customer, Walnut Hill Farm, LLC.  I

spoke with the Controller for Walnut Hill Farm's parent corporation, J.H., and with C.L., the

daughter of Walnut Hill Farm's principal.

i.   I showed C.L. two PFC financing agreements purportedly signed

by her, Contract # 34420 dated 10/12/16 and Contract # 34348 dated 10/4/16.  Both contracts

were for the same insurance policy, GAIC policy # 0336806.  C.L. and J.H. both agreed there

was no reason to finance the same policy twice in the same year.

ii.   C.L. said she did not recall signing either agreement, although the

signature looked similar to hers.  She said the date next to the signature was not her handwriting.

She also said that she never authorized anyone at Insurance Services to sign her name to any

documents.

iii.   I reviewed PFC records and determined that PFC deposited funds

into LEVESQUE's Insurance Services account, Acct. # 0171, in connection with both financing

agreements.

b.   I interviewed Insurance Services customer, R.D.  In the fall of 2016, R.D.

purchased three equine insurance policies through LEVESQUE (GAIC policies AMP # 4003909,

AMP # 0630380, and AMP # 4623616).  R.D. said she gave LEVESQUE her credit card to pay the premiums for the policies.  She said she paid monthly.

      i.  I showed three PFC financing agreements for the policy premiums to R.D..  One agreement related to AMP # 4003909 and AMP # 0630380; the second agreement related to AMP # 0630380; and the third agreement related to AMP # 4623616.  R.D. said she did not sign the agreements and did not recall providing anyone at Insurance Services with authority to sign on her behalf.

      ii.  Furthermore, according to the PFC agreements, two of the financing agreements, submitted within 30 days of each other, related to the same policy, AMP # 0630380, and the effective dates listed on the agreements pre-dated R.D.'s purchase of the policies by several months.  R.D., who was unaware that her premiums were financed at all, said there would be no reason to finance the same policy twice within 30 days.

      iii.  I also reviewed R.D.'s credit card payments, which were processed by Insurance Services' credit card processing company, Elavon.  According to Elavon records, Insurance Services billed R.D.'s credit card for the down payment associated with each financing agreement.  Thus, Insurance Services billed R.D. a down payment for AMP # 0630380 premium twice.  Additionally, Insurance Services billed R.D.'s credit card monthly for each financing agreement meaning that she was paying a monthly payment for AMP # 0630380 twice each month.  Lastly, I noticed that Insurance Services typically billed R.D. $10 more for each transaction than the stated monthly payment on the financing agreement.[3]

---

[3] In reviewing Elavon records for Insurance Services and comparing them to the financing agreements, I noticed that LEVESQUE/Insurance Services often billed insureds' credit cards for $10 more than the monthly payment.  I asked one insured, L.E., whether she had authorized this surcharge.  She denied authorizing this practice.

iv.  In addition to overbilling R.D.'s credit card, I reviewed PFC records and determined that PFC deposited funds into LEVESQUE's Insurance Services account, Acct. # 0171, in connection with all three financing agreements.  I also reviewed information provided by GAIC and determined that LEVESQUE did not forward the funds collected from R.D. and PFC to GAIC as he should have.

v.  At the conclusion of my interview with R.D. on 9/13/18, she told me that LEVESQUE recently texted R.D. to let her know that he was selling equine insurance again.  This message was similar to a text received by another insured that I interviewed, D.S.. During my interview with D.S. on 8/1/18, D.S. showed me a text from LEVESQUE, who using the Target Cell Phone.  The text from LEVESQUE read, "Hi just so you know I'm offering equine insurance again.[4]  I hope you will consider me."

c.  I interviewed Insurance Services customer, L.E.  According to L.E. she purchased equine insurance policies through LEVESQUE in the past and she had almost always financed the policy premiums.  She had automatic payments set up with LEVESQUE on her business credit card, XXXX-XXXX-XXXX-9419.

i.  In late 2016, L.E. decided to stop financing her policies because she regularly received cancellation notices from PFC despite the fact that she had authorized payments on her credit card.  According to L.E., LEVESQUE quoted her $3,175 on 10/14/16 to renew her policy on "Clown," she subsequently lowered the coverage on "Clown" and was quoted a premium of $1,925 later on that same date.

---

[4] I know that LEVESQUE surrendered his license in March 2017, shortly after GAIC's audit.  Based upon my review of the online records of the National Association of the Insurance Commissioners, I do not believe that LEVESQUE had an insurance license as of the date of his text to D.S.

11

ii.  I reviewed the records of Insurance Services' credit card

processing company, Elavon, and saw that L.E.'s credit card had been billed $1,925 on October

14, 2016. L.E. confirmed that this was her full premium payment for "Clown."

iii.  I then showed L.E. a PFC financing agreement for GAIC Policy #

AMP 4028643 dated 10/3/16. This agreement was to finance a $3,175 premium and provided

for a $953 down payment. Elavon records showed that Insurance Services billed L.E's credit

card on 10/3/16 for $953. L.E. said she did not sign the PFC agreement, nor did she authorize

anyone to sign on her behalf or intend to finance her policy premium.

iv.  According to records I received from GAIC, Policy # AMP

4028643 was the policy for "Clown" for 11/25/15 – 11/26/16 with a premium of $2,375. GAIC

subsequently said that the policy renewal quotes provided by LEVESQUE to L.E. on 10/14/16 of

$3,175 and $1,925 were in fact higher than what the policy would have actually cost at that time.

v.  Based upon my review of the PFC records, the GAIC records, the

Elavon records and my interview with L.E., I believe that LEVESQUE caused L.E.'s credit card

to be billed for the full policy premium on "Clown" of $1,925. I also believe that LEVESQUE

caused a financing agreement to be submitted to PFC for $3,175 for Policy # 4028643 for

"Clown," although L.E. had not authorized the renewal of the "Clown" policy at that rate, nor

had she authorized anyone to sign the financing agreement on her behalf. I also believe that

LEVESQUE caused L.E.'s credit card to be billed for the down payment to finance the $3,175

policy premium on "Clown" without her authorization.

vi.  During the interview, L.E. showed me her text conversations with

LEVESQUE regarding L.E.'s policy on "Clown." LEVESQUE used the Target Cell Phone to

text L.E.. On 10/14/16, LEVESQUE texted L.E. asking if she wanted to renew her policy on

"Clown." LEVESQUE made no mention of the PFC financing agreement for "Clown" (AMP 4028643) that was previously submitted in L.E.'s name on 10/4/16, nor did he mention that L.E.'s credit card was billed $953 on 10/3/16 as a down payment for the financing agreement. During the exchange, L.E. discussed lowering her premium on "Clown" to $1,925. Later in the text exchange on 10/14/16, L.E. authorized LEVESQUE to charge her credit card for the full amount of the premium, $1,925.

      vii.  It is clear from the text conversation that L.E. believed that she had renewed her policy on "Clown" after lowering the premium to $1,925, and that she believed she had paid the premium in full for 2016-2017. She asked LEVESQUE why she should pay for the policy in October 2016 when her old policy did not expire until 11/25/16. LEVESQUE told her "it should go in now especially with the founder and the xtra underwriting I like to have a policy issued and in your hands by the effective date That takes some time."

18.    Ms. Gallagher also said that PFC discovered that Insurance Services had initiated financing for policies that did not exist, i.e., "ghost policies." PFC reviewed its records and determined that it had provided more than $500,000 in funds to LEVESQUE for which PFC was not repaid. Ms. Gallagher explained that the majority of PFC's loss resulted from "ghost policies." The following constitutes examples of "ghost" policies financed by LEVESQUE:

    a.  Between on or about April 4, 2016 and on or about October 31, 2016, PFC deposited $25,477.25 into LEVESQUE's Insurance Services Acct. # 0171 in connection with the purported financing of premiums for five insurance policies in the name of Up 2 and Wider, LLC. According to records maintained by the Rhode Island Secretary of State, Up 2 & Wider is an LLC created by LEVESQUE and his wife in April 2012. According to GAIC representatives, Up 2 & Wider, LLC was for horses partly owned by LEVESQUE, and it had one

insurance policy with GAIC (AMP-E124712-00-00) for which the premium was financed with PFC. But, according to GAIC, the five insurance policies associated with the $25,477.25 in financing received from PFC either do not exist, relate to another insured's policy, or relate to cancelled policies.

b. Between on or about July 18, 2016 and on or about November 8, 2016, PFC provided $323,840 in funds to Insurance Services purportedly to finance premiums for three equine insurance policies for "The Wellington Group," supposedly located at 10713 Greenwich Ln, West Palm Beach, FL 33414. Investigation by the U.S. Postal Inspection Service revealed that this address is currently vacant and has been vacant for some time. None of the financing agreements listed a policy number, and GAIC, the identified insurer, confirmed that "The Wellington Group" did not have insurance policies with GAIC. Furthermore, during the GAIC audit on January 24 and 25, 2017, LEVESQUE admitted to auditors that these were ghost policies he created to receive funds from PFC. I reviewed online records of the Florida Secretary of State. I could not locate a record of a Wellington Group LLC registered at 10713 Greenwich Ln. West Palm Beach, FL 33414. Further, there are no LLC's registered to the address: 10713 Greenwich Ln. West Palm Beach, FL 33414. I also searched for "Randall Levesque" as a Registered Agent for any LLC's and did not find any. Lastly, I reviewed a financing agreement with Insurance Finance Corporation ("IFC") for "Up to & Wider," which I believe to be LEVESQUE's company Up 2 & Wider referenced in paragraph 18a, and noticed that the same street address, 10713 Greenwich Lane, and zip code, 33414, was listed for Up 2 & Wider even though the city was identified as Wellington.[5]

---

[5] I know that Wellington is a section of West Palm Beach.

c.  Between on or about April 20, 2016 and on or about June 1, 2016, PFC provided $300,606 in funds to Insurance Services purportedly to finance premiums for two GAIC equine insurance policies for M.M.  GAIC provided M.M. with copies of PFC finance agreements #33414 and #33055 for review and M.M. told GAIC that he had never seen the documents and he did not sign them.  According to GAIC, M.M. did have a valid policy # AMP 062873-03-00 effective 8/14/16 with a gross premium of $89,400.  M.M. told me that he paid for his GAIC policy in full and that he did not finance any insurance premium with PFC.  M.M. said that he paid LEVESQUE with a check that probably came from K.G.  I reviewed records from Citizens Bank for Acct. #0171 in the name of Insurance Services and found a deposited check from K.G. dated 7/5/16 in the amount of $27,420 made payable to Insurance Services.  The check is noted at the top with: "Account: AMP0628738".

19.  An RISP detective interviewed J.E., an insured who believed that she had financed two premiums with PFC.  Based on my review of GAIC records and my conversation with the GAIC auditor, I know that LEVESQUE renewed and billed J.E. for two policies (AMP 0593406 and AMP 0333622), but he did not inform GAIC that he had renewed the policies.  According to the insured, LEVESQUE arranged for her to finance the premiums and she paid by credit card.  Insurance Services collected the premium through PFC financing (PFC Contract # 34258 for policy AMP 0593406 and PFC Contract #34343 for policy AMP 03333622), but did not forward either premium to GAIC.  Further, with respect to one of those policies, AMP 0593406, Insurance Services submitted two financing agreements to PFC (Contract # 34039 dated 8/22/16 and Contract # 34258 dated 9/19/16) and received funds from PFC twice for the same policy, none of which was forwarded to GAIC.  During J.E.'s interview with a detective with the RISP, the detective showed J.E. all three financing agreements.  She denied that she had

15

signed any of the financing agreements that were purportedly signed by her, although she was aware that her two policy premiums were financed.

### *Insurance Finance Corporation*

20.     IFC is a small financing company located in West Des Moines, Iowa that began to do business with LEVESQUE in October 2016 based upon a referral from PFC.  IFC financed policies for Insurance Services' clients.  Typically, Insurance Services would email IFC the financing agreement, IFC would then disburse funds to Insurance Services.  IFC then would mail financing statements to the insured and verify the insurance policy with the insurance company. Although IFC's normal business practice was to send funds directly to the insurance company, because PFC referred LEVESQUE to them, IFC varied from their normal practice and instead sent the funds to LEVESQUE for remittance to the insurance company.  Shortly after beginning their relationship with LEVESQUE, IFC discovered that LEVESQUE was financing premiums for policies that did not exist or for insureds who did not know that their premium was financed. As a result, IFC believes that it incurred a loss of over $40,000 for premium financing provided by IFC to LEVESQUE for policies that did not exist or for which the insureds did not consent to financing of the premium.

a.     For example, I reviewed records and information provided by IFC and the Hartford Financial Services Group ("Hartford") related to $8,831.25 in IFC financing disbursed to Insurance Services for the premium for an equine policy with Hartford.  On January 11, 2017, Insurance Services completed and sent an IFC financing agreement to IFC for the Hartford policy, policy number "TBD."  The borrower (insured) listed on the agreement was "Up to and Wider LLC, 10713 Greenwich Ln, Wellington, FL 33414."  The address listed for "Up to and Wider" on the financing agreement is the same street address and zip code listed for "The

16

Wellington Group" referenced above in paragraph 18b. According to Hartford, the last policy "Up 2 and Wider LLC" had with Hartford was cancelled in December 2014. Thus, based upon my review of the records, I believe that LEVESQUE caused a false financing agreement to be sent to IFC for a policy that did not exist in order to obtain financing funds from IFC.

21.     Based upon my investigation, I believe there is probable cause to believe that LEVESQUE abused his position as a licensed agent to defraud insureds, insurance companies GAIC and AEIG, financing companies PFC and IFC, and others. I believe LEVESQUE committed this fraud in several ways:

a.     LEVESQUE overbilled and double-billed insureds when billing their credit cards for premiums. He also caused their signatures to be forged on unauthorized financing agreements that were submitted to PFC.

b.     LEVESQUE collected premiums for policies issued by GAIC and AEIG but did not forward those premiums to the insurance companies. The insurance companies honored the policies because the insureds' paid for them. LEVESQUE collected but did not remit to the insurance companies over $800,000 in premiums.

c.     I also believe that LEVESQUE financed premiums on behalf of insureds, sometimes without the insureds consent or knowledge. Additionally, LEVESQUE submitted financing agreements to PFC and IFC for fictitious insureds, for whom there were no insurance policies. LEVESQUE used the funds received from PFC and IFC personally instead of forwarding them to GAIC and AEIG. LEVESQUE fraudulently obtained over $500,000 in financed premiums from PFC and IFC.

d.     LEVESQUE also charged insureds' credit cards for premiums that were not provided to the insurance companies. In some instances, when the policies were not honored

17

LEVESQUE's credit card processor, Elavon, refunded the insureds' funds incurring a loss of $80,000.

22.     I have learned from RISP that LEVESQUE applied a permit to purchase a pistol on 10/18/16 at a gun store in Middletown, RI. According to personnel at the Bureau of Alcohol, Tobacco, Firearms & Explosives, there is a mandatory seven-day waiting period in the State of RI to purchase a pistol. I believe that LEVESQUE[6] is likely to pick-up his pistol in the near future. Based on this information, I believe LEVESQUE, who may no longer reside in the state, is likely to be in the State of Rhode Island and in possession of the Target Cell Phone at the time he may retrieve his newly purchased pistol. If my request for a warrant is granted, I plan to arrest LEVESQUE at that time and to seize the Target Cell Phone.

## THE TARGET CELL PHONE

23.     Based upon my interview with insureds, I believe LEVESQUE used the Target Cell Phone to conduct his business at Insurance Services and that he continues to use the Target Cell Phone and conduct business on that phone. In my experience, people who own and use cellphones often have them on their person.

24.     In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as

---

[6] I spoke with officers at the Middletown Police Department who told me that they recalled seizing more than 80 firearms from LEVESQUE after a domestic incident, which has since been expunged from his record. After the incident was adjudicated officers returned the seized firearms to LEVESQUE.

"tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

25. Based on my training and experience, I know that AT&T can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on AT&T's network or with such other reference points as may be reasonably available.

26. Based on my training and experience, I know that AT&T can collect cell-site data about the Target Cell Phone.  Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

19

## AUTHORIZATION REQUEST

27.    Based on the foregoing, I request that the Court issue the proposed arrest warrant

for LEVESQUE for violations of 18 U.S.C. §§ 1343 and 1028A.  I also request that the Court

issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18

U.S.C. § 2703(c).

28.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal

Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until

30 days after the collection authorized by the warrant has been completed or until LEVESQUE is

arrested.  There is reasonable cause to believe that providing immediate notification of the

warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice

to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing

investigation, as such a disclosure would give that person an opportunity to destroy evidence,

change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. §

3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the

proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. §

3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or

electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic

information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18

U.S.C. § 3103a(b)(2).

29.    I further request that the Court direct AT&T to disclose to the government any

information described in Attachment B that is within the possession, custody, or control of

AT&T.  I also request that the Court direct AT&T to furnish the government all information,

facilities, and technical assistance necessary to accomplish the collection of the information

described in Attachment B unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the Target Cell Phone on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

30.     I further request that the Court authorize execution of the search warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

31.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

JOHN PETRICIG
Senior Special Agent
U.S. Secret Service

Subscribed and sworn to before me on _____Oct 26_____, 2018, in Providence, RI.

_____
PATRICIA A. SULLIVAN
UNITED STATES MAGISTRATE JUDGE

21